IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BRYAN R. GIPSON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 05-0601-WS-C |
| ) | |
| MARK A. MATTOX, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter comes before the Court on plaintiffs' Motion to Strike an Affirmative Defense and for a Summary Judgment on Two Affirmative Defenses (doc. 41), as well as on defendant's Motion for Summary Judgment (doc. 43). Both motions have been briefed and are ripe for disposition.

**I.   Background.**

   *A.   Nature of the Case.*

   On October 17, 2005, plaintiffs Bryan R. Gipson ("Gipson") and Chem Technologies of Mississippi, Inc. ("ChemTech") filed a Complaint for Declaratory Judgment and Relief Pursuant to 35 U.S.C. § 256 (doc. 1). The Complaint alleges that the United States Patent and Trademark Office wrongfully issued U.S. Patent No. 6,866,048 (the "'048 Patent") to defendant Mark A. Mattox ("Mattox") on or about March 15, 2005. According to the Complaint, Gipson developed the formula for the '048 Patent on his own, prior to being employed by Mattox's company; however, Mattox applied for and received the '048 Patent, by concealing and misrepresenting material facts. (Complaint, ¶¶ 8-10.) The Complaint further alleges that Gipson has assigned all of his interests in the invention to plaintiff ChemTech. (*Id.*, ¶ 12.) Plaintiffs seek a declaratory judgment that Mattox improperly obtained the '048 Patent because he did not invent the subject invention, that any assignment of the '048 Patent by Mattox is null and void, and that any agreement Mattox may have made concerning the invention is null and void. Plaintiffs also request that this Court order the Director of the U.S. Patent and Trademark Office to substitute

Gipson as inventor of the '048 Patent and to delete Mattox as inventor of that patent, pursuant to 35 U.S.C. § 256.

In his Answer (doc. 26), Mattox denied the substantive allegations of the Complaint pertaining to the '048 Patent's inventorship, and proffered a number of affirmative defenses, including, *inter alia*, defenses of breach of employment agreement and misappropriation of trade secret information.

### B.    *Factual Background for Defendant's Motion for Summary Judgment.*[1]

The '048 Patent recites Mattox as the inventor and reflects that the invention "relates to a method of treating dry gas pipe or processed fluid pipe lines that are susceptible to the build up of iron sulfide deposits, by complexing iron sulfide found in these pipe lines." (Defendant's Exh. A, at 2.) The '048 Patent has been used to market a product known as SWP-105. (Mattox Dep., at 44.)[2] The primary question posed by this lawsuit is whether Mattox or Gipson should be credited with inventorship of the chemical formula for SWP-105, and other aspects of the '048 Patent.[3]

Defendant Mattox is the founder and sole shareholder of a company called Southern Water Management, Inc. ("SWM"), which is not a party to this action. (Mattox Dep., at 12.)[4] SWM's initial focus was in the water treatment and specialty chemical business. (*Id.* at 14.)

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005). Thus, as to Mattox's motion for summary judgment, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

[2]    The product name is short-hand for the "Southern Water Pipeline" and the 5% blend of the active ingredient used in the product. (Gipson Dep., at 91.)

[3]    Neither side's briefs spell out the factual sequence of events with clarity. Accordingly, the recitation of facts presented herein is based on scrutiny of the often fragmentary and incomplete summary judgment record.

[4]    SWM became Synergy Chemicals, Inc. in August 2001. (Mattox Dep., at 12.) The name change is not material to these proceedings; therefore, to avoid confusion, the company will be referred to herein as "SWM" both prior to and subsequent to the name change.

Mattox hired Gipson to work for SWM in April 2000.  (*Id.* at 27; Gipson Dep., at 19.)   Mattox testified that he (Mattox) invented SWP-105 over a period of months, beginning in the late spring or early summer of 2000, and extending into 2001.  (Mattox Dep., at 36, 44.)  Mattox flatly denied that Gipson conceived the idea of a product to dissolve iron sulfide deposits in pipelines utilizing a compound containing tetrakis (hydroxymethyl) phosphonium sulfate ("THPS").  (*Id.* at 36.)  Indeed, according to Mattox, Gipson did not contribute to the invention of SWP-105 at all and never had a good idea relating to this invention.  (*Id.* at 59, 61.)

Gipson's account of the invention of SWP-105 is far different.  Gipson testified that in 1999, before he began working for SWM, his duties for his then-employer included cleaning bacteria and debris out of gas pipelines using a product called MPA 7747, which was a blend of THPS and water.  (Gipson Dep., at 45.)  As shipped by the manufacturer, Rhodia, MPA 7747 featured a blend of 20% THPS, but Gipson's then-employer (non-party SII ChemTechnologies of Louisiana) diluted it further to 10%.  (*Id.* at 50-51, 71.)  Apparently water and THPS were the only ingredients in the MPA 7747 product.  The 10% mixture of THPS was intended for use as a biocide, to kill bacteria that otherwise built up in the gas pipelines.  (*Id.* at 46.)  Gipson discovered through his activities in the field that as the percentage of THPS was lowered (*e.g.*, as the MPA 7747 product was diluted), the solution became less effective for its stated purpose of killing bacteria but dramatically more effective in dissolving iron sulfide deposits in tanks and pipelines.  (*Id.* at 48-50.)[5]  Upon observing that a weaker solution eradicated iron sulfide, Gipson began conducting independent research and field studies at his house.  (*Id.* at 53.)  Such testing consisted of trying different blends of THPS and water (with no other ingredients), from 20% THPS down to 1% THPS, and observing their effects on iron sulfide.  (*Id.* at 61-62, 67-68.)

---

[5]   Gipson described a "eureka" moment in which he had mistakenly left the bung out of a drum that he had been using to pump MPA 7747 into the lines at an oil field production water treatment system in Citronelle, Alabama in or around 1999.  By the time he used the drum again, it had rained heavily, filling the drum half-full of water and diluting the MPA 7747.  A short time after he dumped this diluted solution into the tank, Gipson discovered that the entire iron sulfide collection on the bottom of the tank was gone, such that the solution had dissolved the existing iron sulfide deposits.  (Gipson Dep., at 51.)  By Gipson's calculations, the rainwater/THPS solution he had used had a concentration of THPS of approximately 5%.  (*Id.* at 52-53.)  By contrast, the concentration of THPS in MPA 7747 as used by Gipson's employer for biocide purposes was 10%.  (*Id.* at 50-51.)

Based on these tests, Gipson concluded that a blend of 95% water and 5% THPS "really did the job" in removing iron sulfide deposits. (*Id.* at 65-67.) Gipson felt that the effects of diluting MPA 7747 were "definitely different" than what others in the field were doing because the product became "more reactive," such that he regarded his formula as an invention. (*Id.* at 64-65.)[6]

According to Gipson, prior to arriving at SWM in April 2000, Gipson discussed aspects of his invention with Kansas Hernandez (a representative of Rhodia, the manufacturer of MPA 7747) and Mattox. (Gipson Aff., ¶ 5.)[7] Moreover, the record reflects that other employees of SII Chem Tech (for whom Gipson was working in 1999) reported that the 10% blend of THPS yielded iron sulfide reduction as compared to the 20% blend, and the topic was discussed at staff meetings. (Gipson Dep., at 60.)

When Gipson began working at SWM in April 2000, a customer contacted him and expressed interest in this iron-sulfide reducing product for a gas transmission pipeline. (*Id.* at 68-69.) Mattox agreed to allow Gipson to try Gipson's formula on the customer's pipeline. (*Id.* at 69.) In the summer of 2000, Mattox and Gipson met with Hernandez, the Rhodia representative, about whether SWM could use the Rhodia MPA 7747 product in diluted fashion

---

[6] In addition to his field testing, Gipson reviewed technical papers on the subject. (*Id.* at 53-54, 56-58.) However, he acknowledged that he did not have knowledge, from a scientific standpoint, of why the product worked better with a 5% THPS blend than with other percentages. (*Id.* at 67.) He also disclaimed any understanding of why ammonium chloride caused the mixture to be more reactive, how THPS was manufactured, or even what the acronym THPS stood for. (*Id.* at 80.) When asked to explain how THPS dissolves iron sulfide, Gipson testified, "All I know is it works. That's it." (*Id.* at 98-99.) Of course, scientific expertise as to why an invention works is not a legal prerequisite to inventorship status.

[7] Gipson's Affidavit conflicts in this regard with his deposition testimony, wherein he stated that he never shared his findings that diluting MPA 7747 reduced iron sulfide with anyone until he arrived at SWM. (Gipson Dep., at 53, 57.) Gipson would explain the inconsistency by stating that he "was confused with the questioning" in his deposition. (Gipson Aff., ¶ 5.) An affidavit may be stricken as a sham when it directly contradicts, without explanation, a witness's previous sworn testimony. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). However, defendant has not invoked the sham affidavit rule, nor has he otherwise sought to have Gipson's affidavit stricken, and Gipson has offered an explanation for the discrepancy. The undersigned will not unilaterally strike down this affidavit as improper.

for iron sulfide removal, as compared to the biocide applications for which Rhodia marketed and sold the product. (*Id.* at 72, 81.) Hernandez gave the pair Rhodia's blessing to use the diluted MPA 7747 for iron sulfide applications, suggested that they add a small quantity of ammonium chloride to the mixture to improve its reactivity, and also recommended that they keep the product within a target pH range. (*Id.* at 72-75.) Hernandez specifically suggested that ammonium chloride be added at a ratio of 0.1% for each 1% of THPS. (*Id.* at 140-41, 174-75.) Because the total THPS concentration was 5%, Hernandez recommended adding 0.5% ammonium chloride. (*Id.* at 141, 174-76, 177.)

Armed with Hernandez's suggestions, Mattox and Gipson "did the same pretty much backyard testing" that Gipson had done earlier, with the addition of ammonium chloride and monitoring pH levels. (*Id.* at 75-76.)[8] Gipson initially did this testing himself, then he and Mattox "sat there and played with it as far as those different blends." (*Id.* at 78.) Based on these efforts, they found that the product "worked even better" with Hernandez's modifications. (*Id.* at 72.)[9] Gipson admits that the ideas of adding ammonium chloride and remaining within a designated pH range originated from Hernandez, and that Gipson simply "followed his recipe" in modifying the invention. (*Id.* at 82.) Once Gipson and Mattox began using SWP-105 in the field, they found that it worked successfully, and that no changes to the formula were necessary. (*Id.* at 96.) SWP-105 was blended to consist of 5% THPS and 0.5% ammonium chloride, mixed

---

[8] At his deposition, Gipson was unable to recall whether ammonium chloride tended to reduce or increase the observed pH, again underscoring his lack of scientific expertise in the chemistry field. (*Id.* at 77-78.) He was also unable to recite the specific formula of the product, including its precise concentration of ammonium chloride. (*Id.* at 76, 83, 85, 139-41.) As discussed *infra*, these facts have negligible bearing on whether Gipson is the true inventor.

[9] Just as the summary judgment record reflects a lack of chemistry knowledge on Gipson's part, it does the same for Mattox. For example, in May 2001, Mattox e-mailed Dr. Edward Valente, a chemistry professor at Mississippi College, concerning SWP-105. Mattox indicated that he would be sending samples to Dr. Valente because he "would like to see if we can determine the mechanism [*sic*] of the product .... If we can determine how the product is working, then we can provide a better product for the field." (Mattox Dep., at 38 and Exh. 1.) Thus, Mattox effectively confessed ignorance of why SWP-105 worked the way it did. Again, however, there is no legal requirement of chemistry expertise as a prerequisite to claiming inventorship rights, so any weaknesses of Mattox and Gipson in this department are largely irrelevant.

in water. SWM's records reflect that the product was first sold in August 2000. (Mattox Dep. at 116.)

Hernandez's Affidavit corroborates Gipson's narrative. According to Hernandez, before Gipson began working for SWM, Gipson informed him that "he had discovered by trial and error about iron sulfide dissolving capabilities of a 5% blend of THPS. ... Mr. Gipson was the first person I know of that discovered the 5% solution for that application. ... Mr. Gipson and I discussed his 5% blend discovery numerous times." (Hernandez Aff., ¶ 6.) Hernandez also confirms Gipson's account of the meeting among Hernandez, Gipson and Mattox, at which Hernandez authorized SWM to use the 5% blend and suggested the inclusion of ammonium salts at a specific ratio. (*Id.*, ¶ 7.) Hernandez avers that Mattox did not actively participate in the meeting's technical discussions regarding the invention. (*Id.*, ¶ 8.) Hernandez also minimizes his ammonium salts modification, which he describes as "merely an arithmetic function based on Mr. Gipson's 5% THPS blend discovery." (*Id.*, ¶ 10.)

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

### III.     Analysis of Defendant's Motion for Summary Judgment.

In a nutshell, Mattox argues that he is entitled to summary judgment because plaintiffs have failed to make a legally sufficient showing that Gipson invented the invention that is the subject of the '048 Patent.

#### *A.     Applicable Patent Law Principles.*

Because a patent carries a statutory presumption of validity, a plaintiff seeking to substitute himself as inventor on an existing patent must show by clear and convincing evidence that he in fact invented the invention that is the subject of the patent. *See Stern v. Trustees of Columbia University in City of New York*, 434 F.3d 1375, 1377 (Fed. Cir. 2006); *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir. 2002) (recognizing "presumption that the named inventors on a patent are the true and only inventors"); *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp.2d 1126, 1130 (E.D. Cal. 2002) ("A party seeking to invalidate a patent for failure to name an inventor ... bears the burden of proving invalidity by clear and convincing evidence."); 35 U.S.C. § 282 ("A patent shall be presumed valid. ... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."). Thus, the critical question on summary judgment is whether Gipson and ChemTech can show by clear and convincing evidence, after all reasonable inferences are drawn in their favor, that Gipson invented the '048 Patent. *See Stern*, 434 F.3d at 1377.[10]

To meet this heightened threshold, plaintiffs must present more than Gipson's testimony, but must also submit corroboration. *See Stern*, 434 F.3d at 1378; *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006) ("the corroboration requirement provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony"). The sufficiency of plaintiffs' corroborating evidence turns on evaluation of all pertinent evidence so that a sound determination of the credibility of Gipson's story may be reached. *See Trovan*, 299 F.3d at 1302. Corroborating evidence "preferably comes in the form of physical records that were made contemporaneously

---

[10]     The rationale for this heightened standard is that, in the inventorship context, "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard." *Hess v. Advanced Cardiovascular Systems, Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).

with the alleged prior invention," *id.*, but may also consist of circumstantial evidence about the inventive process or reliable testimony from someone other than the plaintiff.  *Id.* at 1302-03; *Checkpoint Systems, Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005) (corroborating evidence may include physical, documentary or circumstantial evidence, or reliable testimony from one other than an interested party).  The sufficiency of corroborating evidence is evaluated on a "rule of reason" basis, and is a question of fact reviewed on appeal for clear error.  *Medichem*, 437 F.3d at 1170-71.

"A patent is invalid if more or fewer than the true inventors are named."  *Gemstar-TV Guide Int'l, Inc. v. International Trade Com'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).  "The 'inventor,' in patent law, is the person or persons who conceived the patented invention."  *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1352 (Fed. Cir. 1998); *see also Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is the touchstone of inventorship.").  "Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."  *Trovan*, 299 F.3d at 1302 (citations omitted).  "An idea is definite and permanent when the inventor has a specific, settled idea, not just a general goal or research plan he hopes to pursue."  *Burroughs Wellcome*, 40 F.3d at 1228.  Stated differently, conception is complete when the inventor's idea is so clearly defined that one of ordinary skill could reduce the invention to practice, without extensive research or experimentation.  *See Stern*, 434 F.3d at 1378; *Invitrogen Corp. v. Clontech Laboratories, Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005) (in context of chemical compound, conception is complete when inventor can define compound so as to distinguish it from other materials, and can describe how to obtain it).

"Inventorship is a question of law, applied to the relevant facts."  *Chiron*, 268 F. Supp.2d at 1131.  It also has been characterized as "one of the most difficult issues in American patent law."  *C.R. Bard*, 157 F.3d at 1352 (citation omitted).  It is that weighty endeavor to which the Court now dedicates itself.

### B.     Sufficiency of Plaintiffs' Evidence of Inventorship.

Mattox's position on summary judgment is that plaintiffs have failed to proffer sufficient corroborated evidence of inventorship to satisfy the clear-and-convincing standard.  The Court disagrees.  Viewed in the light most favorable to plaintiffs, the evidence shows that Gipson

discovered, based on his own field research and testing, that a 5% blend of THPS has iron sulfide-depleting properties superior to other formulations and concentrations. Gipson's evidence is that he made this discovery in 1999, long before he began working for SWM, based on his own field experiences and extensive research. Gipson's evidence further shows that he informed Mattox of his invention and subsequently began working for Mattox's company, at which time Gipson secured a customer who was interested in the iron sulfide-removal treatment contemplated by the invention, and set up a meeting with Hernandez to discuss Rhodia's position on the invention, all without material involvement by Mattox. Based on Hernandez's suggestions, Gipson's evidence demonstrates, Gipson refined the invention slightly by adding a small concentration of ammonium salts and monitoring the pH levels.

If Gipson's testimony is accepted as true, as it must be for summary judgment purposes, conception of the invention was complete before he ever went to work for SWM. Based on his own field research and experimentation, Gipson had formed a definite and permanent idea that a 5% solution of THPS in water would dissolve iron sulfide deposits in pipelines. His idea was specific and settled, and was not simply a general notion that dilution of THPS from its concentrations in MPA 7747 might remove iron sulfide. Moreover, Gipson was ready to apply that idea to practice, long before his association with Mattox. Viewing the evidence in the light most favorable to plaintiffs, then, Gipson conceived the invention covered by the '048 Patent before he ever presented the idea to Mattox and before the time when Mattox claims to have commenced the inventorship process. Because conception is the touchstone of invention, Gipson's unequivocal testimony of how and when he developed the formula for the invention of the '048 Patent constitutes clear and convincing evidence that, if believed at trial, would establish him as the true and rightful inventor.

That said, Gipson's own testimony is not enough to overcome defendant's summary judgment challenge; rather, it must be corroborated by other evidence using a rule of reason. Unquestionably, plaintiffs' primary source of evidence presented on summary judgment is Gipson's testimony. Plaintiffs have failed to corroborate the testimony with contemporaneous physical evidence; however, they have offered the testimony of Kansas Hernandez (who does not claim co-inventorship and who is not an interested party) to corroborate Gipson's statements. Hernandez confirms many relevant and highly significant aspects of Gipson's story, including

the timing of Gipson's discovery, the substance of that discovery, Hernandez's input regarding ammonium salts, and the relative non-involvement of Mattox. Applying the rule of reason, and viewing all evidence in the light most favorable to the non-movants, the Court concludes that Hernandez's Affidavit provides sufficient corroboration of Gipson's account of the inventorship of SWP-105 to withstand summary judgment.[11]

Confronted with plaintiffs' factual showing, Mattox proffers three distinct counterarguments. First, he insists that plaintiffs' evidence is insufficient because Gipson has not shown by clear and convincing evidence that he invented <u>each</u> of the 12 claims set forth in the '048 Patent. Second, defendant insists that even under Gipson's account, his conception of the invention was incomplete without the ammonium salts component added while Gipson was working for SWM. Third, defendant argues that Gipson's evidence cannot be deemed clear and convincing because his deposition testimony evinced uncertainty and confusion about the actual formula of the invention.

Defendant is correct that the '048 Patent specifies 12 claims.[12] Mattox argues that

---

[11] Defendant complains that plaintiffs' corroboration evidence at trial may include documents that plaintiffs failed to disclose in their Rule 26 disclosures or otherwise in the discovery process. (Reply Brief, at 5-6.) But plaintiffs do not contend that they intend to use any such documents; rather, plaintiffs state only that in addition to the documents that were disclosed, "[t]hey also plan to call corroborating witnesses" who have been identified to defendant. (Opposition Brief, at 7.) As defendant's claim of potential discovery violations does not relate to any document submitted on summary judgment, the issue is not properly before the undersigned. To the extent that defendant wishes to pursue this issue further, it should be addressed via motion in limine at an appropriate time.

[12] Those claims are as follows: the method of cleaning iron sulfide deposits from dry gas pipelines by using water, 5% THPS and 0.5% ammonium salts (Claim 1), the method of adding that solution continuously to a dry gas pipeline (Claim 2), the method of adding that solution intermittently to a dry gas pipeline (Claim 3), the method of cleaning iron sulfide deposits from dry gas pipelines by using water, 5% THPCl (tetrakis (hydroxymethyl) phosphonium chloride), and 0.5% ammonium salts (Claim 4), the method of using that THPCl solution continuously (Claim 5), the method of using that solution intermittently (Claim 6), the method of cleaning iron sulfide deposits from oil pipelines using the THPS solution (Claim 7), the method of adding that solution continuously (Claim 8), the method of adding that solution intermittently (Claim 9), the method of cleaning iron sulfide deposits from oil pipelines using the THPCl solution (Claim 10), and the method of adding that solution continuously (Claim 11) or intermittently (Claim 12).

Gipson cannot defeat summary judgment without clear and convincing evidence of Gipson's inventorship of "each of the twelve (12) claims contained in the '048 Patent." (Reply Brief, at 1.) This is a correct statement of law. *See, e.g., Trovan*, 299 F.3d at 1302 ("inventorship is determined on a claim-by-claim basis"). Pragmatically, however, neither side has made any effort to compare plaintiffs' evidence to the '048 Patent on a systematic, claim-by-claim basis. Instead, both sides focus on the chemical formula aspect, without separating out particular claims or aligning particular facts to particular claims. The interests of justice, efficiency and judicial economy would not be served by the Court unilaterally analyzing the sufficiency of plaintiffs' evidence as to each of the 12 claims, without the benefit of any assistance, input or argument from any party, and without an adequately developed record. It is clear that plaintiffs have proffered sufficient evidence to defeat summary judgment as to at least certain of the claims. As to others, defendant may well be entitled to judgment as a matter of law.[13] On this record and given this glaring omission from the record and the parties' briefing, however, the Court is not equipped to make that determination. Accordingly, the sufficiency of plaintiffs' evidence to show inventorship of each of the 12 claims encompassed by the '048 Patent must await disposition at trial.[14]

With regard to the ammonium salts issue, defendant's position is that Gipson cannot

---

[13]   For example, the Court cannot determine from the record what involvement, if any, Gipson had in developing a THPCl formulation for cleaning iron sulfide deposits, as all of his testimony in the record relates to THPS. Likewise, the Court cannot assess what interest (if any) plaintiffs have in the intermittent vs. continuous aspects of the invention, or in its application in oil vs. dry gas pipelines. The record and parties' briefs are woefully underdeveloped in these respects.

[14]   It is expected that the parties' evidence at trial will be organized and presented on a claim-by-claim basis. Moreover, the parties' respective counsel are **ordered** to conference (telephonically or otherwise) on or before **December 8, 2006** to discuss whether there is a *bona fide* disagreement as to Mattox's inventorship status for each of the 12 claims. Reviewing the 12 claims set forth in the '048 Patent, it appears likely that the parties' good-faith dispute embraces only certain of those claims. Therefore, it appears likely that the issues for trial may be substantially narrowed without either party abandoning its entrenched position in this case. The parties are **ordered** to file a joint status report, on or before **December 15, 2006**, stating the results of this conference and identifying the particular claims of the '048 Patent that are disputed for trial purposes.

claim inventorship because Hernandez and not Gipson developed the ammonium feature of the formula. There are two problems here. First, Mattox is trying to have it both ways. In his reply brief, Mattox takes pains to assert that "ammonium is an integral part of the '048 patent .... Without ammonium, conception would not be complete because further extensive research or experimentation would be necessary to ensure the proper functionality of the invention." (Reply Brief (doc. 52), at 4.) Yet in his initial brief, Mattox admits that "[t]he ratio of one percent THPS to point one percent ammonium salt in connection with iron sulfide depletion was well known in the industry" before the invention of SWP-105. (Defendant's Brief (doc. 43), at 8.) Which is it, an integral part demanding extensive research, or a ratio that is common knowledge? Plaintiffs' evidence (including the Hernandez Affidavit) strongly suggests the latter. Second, Mattox places too much weight on Hernandez's involvement. The law is clear that an "inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998). If the ratio of 0.1% ammonium chloride per 1% THPS is a simple arithmetic function that is well-known in the industry, which the Court must assume for summary judgment purposes, then the mere fact that Hernandez proposed it to Gipson does not deprive Gipson of inventorship or negate prior conception. *See C.R. Bard*, 157 F.3d at 1352 ("others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law"); *Ethicon*, 135 F.3d at 1460 (one who "simply provides the inventor with well-known principles" after conception is not a joint inventor). In this view, the ammonium salts addition was simply part of applying Gipson's invention to practice, and could be done by one of ordinary skill without extensive experimentation. That viewpoint is supported by plaintiffs' evidence, and therefore must prevail at the Rule 56 stage.

Finally, Mattox points to inconsistencies in Gipson's deposition testimony as to the actual chemical formula of the compound covered by the '048 Patent. To be sure, Gipson's testimony on this front was quite shaky. He initially testified that 0.01% of ammonium chloride was added, or "hardly nothing," yielding a final mix of 5% THPS and 0.01% ammonium chloride. (Gipson Dep., at 76, 79, 83.) Gipson then changed his testimony to 0.1% ammonium chloride. (*Id.* at 85, 90.) He then doubled back to "point oh-one" percent, with the qualifier, "I'm still not sure with my math." (*Id.* at 106, 140.) After a break, Gipson indicated that he had

"discovered an error" in his testimony, and that the proper ammonium chloride fraction was 0.1% for every 1% THPS, or a total of 0.5% ammonium chloride for the 5% THPS solution. (*Id.* at 140-41.) Such testimony could certainly be used at trial to challenge Gipson's credibility. But the Court finds for summary judgment purposes that Gipson's lack of clarity as to the specific formula of the '048 Patent, in a deposition taken more than six years after the invention was made, does not preclude Gipson from showing by clear and convincing evidence that he, in fact, invented SWP-105. Inventorship and ability to recall specifics of that invention many years later are two entirely different questions.

For all of these reasons, there are genuine issues of material fact as to whether Gipson will be able to demonstrate at trial by clear, convincing and corroborated evidence that he invented the formula that is the subject of the '048 Patent. Accordingly, Mattox's Motion for Summary Judgment (doc. 43) is **denied** as to that issue.

### C. Sufficiency of Plaintiffs' Evidence of Assignment.

In the alternative, Mattox argues that even if there is sufficient evidence of Gipson's inventorship to withstand Rule 56 review, ChemTech's claims must be dismissed because there is no evidence that Gipson ever assigned his rights to the invention covered by the '048 Patent to ChemTech.

On September 30, 2005, less than three weeks before suit was filed, Gipson and ChemTech executed a one-page document labeled "Assignment of Rights to Invention." (Plaintiffs' Exh. B.) The Assignment provides that Gipson assigned all of his rights, title and interest in "Gipson's invention relating to a method and composition to decrease iron sulfide deposits in pipelines and other conduits (the "Invention") which is currently being marketing [*sic*] by ChemTech under the trademark 'FESFLO', ... including, but not limited to any patent rights...." (*Id.*) The scope of this Assignment is challenged by Mattox on summary judgment. It is undisputed that FESFLO is a different product, a different formula, and a different invention than SWP-105.[15] (Gipson Dep. at 189.) Plaintiffs submit affidavits from both Martin Stephens

---

[15] There is substantial deviation in the record as to the proper spelling of this other invention. In various places, it is labeled FESFLO, FeSFLOW, FeSFlow, and FESFLOW. For simplicity's sake, the undersigned will rely on the spelling and capitalization utilized in the Assignment document, without attempting to reconcile these myriad discrepancies.

(President of ChemTech) and Gipson himself stating their understanding that the Assignment encompasses all of Gipson's rights and interests in any inventions relating to methods for decreasing iron sulfide deposits in pipelines and other conduits, without limiting it to FESFLO. (Stephens Aff., ¶ 4; Gipson Aff., ¶ 4.)

The Assignment is unambiguous that it is limited to an invention "which is currently being marketing [*sic*] under the trademark 'FESFLO.'" Likewise, the record is clear that FESFLO is not the same as Patent '048 or SWP-105, but is instead an altogether different invention for removing iron sulfide deposits.[16] FESFLO is not at issue in, and does not appear relevant to, this lawsuit. These undisputed facts create standing problems for ChemTech, inasmuch as Gipson has never assigned his '048 Patent rights to ChemTech, yet ChemTech is litigating this action as a plaintiff to vindicate precisely those rights, which do not belong to it. ChemTech would overcome this defect by pointing to evidence that both signatories intended the Assignment to embrace the invention that is the subject of the '048 Patent as well. (Opposition Brief, at 8.) But the agreement is unambiguous. Irrespective of whether the assignment is governed by Alabama or Mississippi law, the meaning of an unambiguous contract is derived from the plain meaning of its terms, rather than from the parties' extrinsic evidence as to their subjective intent.[17] Because the Assignment is unambiguously confined on its face to an

---

[16] Gipson testified in his deposition that "FeS Flow is not the same as the 048 patent." (Gipson Dep., at 123.) He repeated the point emphatically: "I'm saying [the '048 patent] is different from FeS Flow." (*Id.* at 131.) In further testimony, he indicated as follows:

    A:    The assignment was FeS Flow.
    Q:    And not for the 048 patent; correct?
    A:    Not for the 048 patent.
    Q:    Thank you. So it is your claim you have developed two inventions, two different formulas; is that right?
    A:    They're two different formulas. So, yes.

(*Id.* at 135.) Gipson has signed no other assignment for ChemTech's benefit. (*Id.* at 127, 132.)

[17] *See Harbison v. Strickland*, 900 So.2d 385, 391 (Ala. 2004) ("It is elementary that it is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation."); *Fadalla v. Fadalla*, 929 So.2d 429, 438 (Ala. 2005) ("General rules of contract interpretation require that the intent of the parties be derived from the words of the

assignment of FESFLO, Gipson and ChemTech cannot rewrite it after the fact to embrace an assignment of the formula for the '048 Patent, as well. Plaintiffs are bound by the plain language of their Assignment.

At present, then, ChemTech lacks standing to pursue Gipson's patent inventorship claims against Mattox. Of course, there is a simple solution to this technical defect, one which plaintiffs could and should have performed as soon as Mattox raised this shortcoming. They could simply execute a new assignment, specifically including Gipson's rights and interests (if any) in the invention covered by the '048 Patent. Both Gipson and ChemTech express willingness to execute another assignment to effectuate this objective. (Stephens Aff., ¶ 4; Gipson Aff., ¶ 4.) For whatever reason, they have not done so. If ChemTech wishes to remain a plaintiff in this litigation, it must promptly execute an appropriate assignment with Gipson. If such an assignment is not executed and filed on or before **December 15, 2006**, ChemTech's claims will be dismissed without prejudice for lack of standing.

## IV.    Analysis of Plaintiffs' Motion Regarding Affirmative Defenses.

Plaintiffs have filed a dispositive motion (doc. 41) of their own, relating to certain affirmative defenses. Mattox's Answer (doc. 26) interposed the following affirmative defenses, among others: (a) Gipson was an employee of SWM at all times relevant to development of technology covered by the '048 Patent, and was subject to an employment agreement regarding intellectual property (Defense #1); (b) misappropriation of trade secrets (Defense #3); and (c) breach of employment agreement (Defense #4). (Answer, at 2.) Defenses #1 and #4 are overlapping, and plaintiffs request summary judgment as to them for failure to comport with the Statute of Frauds. As for Defense #3, plaintiffs ask that it be stricken as irrelevant.

### A.    *Employment Agreement Defenses.*

Alabama's Statute of Frauds provides, in pertinent part, that "[e]very agreement which, by its terms, is not to be performed within one year" is "void unless such agreement ... expressing the consideration is in writing and subscribed by the party to be charged." Ala. Code

---

contract, unless an ambiguity exists."); *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 752-53 (Miss. 2003) ("Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent.").

§ 8-9-2(1).  The parties agree that a written employment agreement between Gipson and SWM is needed to satisfy the Statute of Frauds.  (Plaintiffs' Motion (doc. 41), at 4; Defendant's Brief (doc. 48), at 2, 5.)  Mattox testified that he does not have a copy of any agreement executed by Gipson in connection with his employment by SWM, and no such document appears in the record.  (Mattox Dep., at 8-9, 98.)  On that basis, plaintiffs argue that defendant's affirmative defenses relating to the employment agreement are barred by the Statute of Frauds.  Stated differently, even if Gipson did sign an employment agreement with SWM, even if that agreement did cover intellectual property, and even if Gipson's claim of ownership in the '048 Patent is violative of that agreement, plaintiffs maintain, the Alabama Statute of Frauds and the absence of any written agreement in the record preclude Mattox from establishing such a defense, as a matter of law.

If there were no evidence that Gipson had signed an employment agreement, Defenses #1 and #4 could be quickly dispatched on Statute of Frauds grounds.  But that's not what happened here.  To the contrary, the record includes substantial evidence that Gipson executed a written employment agreement at SWM.  (Mattox Dep., at 88-89, 96.)[18]  There is also evidence that this agreement "covered confidential, intellectual property regarding ownership assignment to the company, trade secrets."  (*Id.* at 92.)  More specifically, the agreement protected intellectual property developed by an employee during his employment.  (Defendant's Exh. B, at 4.)  Mattox has a "template" of the agreement that Gipson signed, so its specific terms are available in this action.  (Mattox Dep., at 88-89.)  According to Mattox, however, the signed agreement vanished from his office when Gipson separated from the company, prompting Mattox to conclude that Gipson had stolen it.  (*Id.* at 89.)

Plaintiffs' Motion for Summary Judgment contends that the mere fact that no written contract now exists means that Defenses #1 and #4 are violative of the Statute of Frauds.  The

---

[18]     In addition to Mattox's deposition testimony, there was sworn testimony at a state court hearing provided by both Mattox and Julie Andrews (a secretary at Mattox's company) that Gipson executed such an agreement.  At the hearing, Mattox testified that Gipson signed the employment agreement in Mattox's presence.  (Defendants' Exh. B (doc. 48), at R-9.)  Andrews testified that she did not observe Gipson signing the document, but that she did see the original of that agreement with Gipson's signature immediately after he executed it.  (*Id.* at 6.)

-16-

Court cannot adopt this strained logic. That no written agreement has been produced today does not require a conclusion that no such document ever existed. If a written agreement previously existed, but was lost, destroyed, or purloined, then defendant can introduce evidence to that effect in order to satisfy the Statute of Frauds. *See* Rule 1004(1), Fed.R.Evid. (allowing secondary evidence of a writing if the originals have been lost or destroyed); *Klein v. Frank*, 534 F.2d 1104, 1108 (5th Cir. 1976) (describing "generally accepted rule that if the party relying upon the writing can prove that a writing existed and has been lost or destroyed, he is relieved of the burden of producing the original and can present secondary evidence of its contents"); *Sims v. Callahan*, 112 So.2d 776 (Ala. 1959) (secondary evidence deemed admissible if writing constituting primary evidence is shown to have been lost or destroyed without fault of party desiring to prove the fact).[19]

Because the evidence taken in the light most favorable to the non-movant demonstrates that the requisite written employment agreement was executed, but has simply been lost, destroyed, or stolen, the Statute of Frauds does not bar these defenses. Accordingly, Plaintiffs'

---

[19] Courts in other jurisdictions have adopted these principles in similar fact scenarios. *See, e.g., McInnis v. Lind*, 108 P.3d 578, 582 n.2 (Or. App. 2005) (observing many common-law exceptions to statute of frauds' prohibition on parol evidence of agreement, including where writing is lost or is in possession of adverse party); *Latino Food Marketers, LLC v. Ole Mexican Foods, Inc.*, 2003 WL 23220142, *5 (W.D. Wis. Aug. 20, 2003) ("if the parties did indeed form a contract that met the requirements of the statutes of frauds, the contract is enforceable even if the writing is lost or destroyed"); *Connecticut Bank & Trust Co. v. Wilcox*, 518 A.2d 928, 931 (Conn. 1986) ("the loss or destruction of a memorandum does not deprive it of effect under the Statute of Frauds," where the writing can be proven by secondary evidence). This line of authority is echoed by Section 137 of the *Restatement (Second) of Contracts*. *See also* comment a ("In cases of loss or destruction, the contents of a memorandum may be shown by an unsigned copy or by oral evidence."); 4 *Corbin on Contracts* § 23.10 (2006) ("If the requirements of the statute of frauds are satisfied by a signed contract or memorandum, the contract remains enforceable even though the writing is lost or destroyed. The contents of the writing can then be proved by parol testimony and the contract enforced."). And Justice Johnstone of the Alabama Supreme Court has opined that when a writing required by Alabama's Statute of Frauds "has been lost or destroyed, *it may be proved by secondary evidence*" pursuant to Rule 1004(1) of the Alabama Rules of Evidence. *Holman v. Childersburg Bancorp.*, 852 So.2d 691, 702 (Ala. 2002) (Johnstone, J., concurring).

Motion for Summary Judgment as to Defenses #1 and #4 is **denied**.[20]

### B.     *Misappropriation of Trade Secrets Defense.*

Finally, plaintiffs seek to strike Defense #3, which alleges that Gipson misappropriated trade secrets from SWM.  In a cursory one-paragraph argument, plaintiffs maintain that this defense is simply irrelevant to the inventorship issues at the heart of this action.  (Motion, at 2.) Defendant's response inexplicably ignores plaintiffs' relevance objection, but instead identifies the trade secrets that Gipson is alleged to have misappropriated, including not only the formula of SWP-105, but also "processes and methods of application of said technology."  (Opposition Brief, at 1.)

The Court understands Mattox's view that the simple chemical formula of SWP-105 is not sufficient to use the product effectively, without knowledge of the particular manners and methods of applying that product.  The Court also understands Mattox's position that those manners and methods of application are trade secrets of SWM, are "not contained in" the '048 Patent, and are not public information.  What the Court does not understand is why any of this matters in a case litigating inventorship rights in the '048 Patent.  If everything Mattox says about trade secrets is correct (*e.g.*, that the application methods are trade secrets of SWM, that those methods are outside the scope of the '048 Patent, and that Gipson stole those trade secrets from SWM), how do those facts have any bearing on whether Gipson is entitled to inventorship status for the '048 Patent?  Defendant has never answered this question, despite it being squarely presented by plaintiffs' Motion.  The Court does not perceive any manner in which misappropriation of trade secrets could pose a viable defense to Gipson's inventorship claims.  If

---

[20]     As an aside, plaintiffs suggest that even if there were a written employment agreement, Mattox was not a party to it and lacks standing to invoke it as a defense.  (Plaintiffs' Motion, at 5-6.)  At trial, this argument may have merit.  At this juncture, however, movants offer no evidence that (a) the written agreement claimed by defendant lacked a valid assignment of intellectual property by Gipson to SWM (or its successor), or (b) SWM (or it successor) failed to assign its rights in SWP-105 to Mattox for patent purposes.  Absent such a showing, this theory cannot be eliminated from consideration on summary judgment.  Stated differently, if Gipson promised in an enforceable written contract to assign rights to intellectual property he developed in SWM's employ to SWM, if Gipson developed the SWP-105 formula while working for SWM, and if SWM in turn assigned its rights in SWP-105 to Mattox in connection with the '048 Patent, then the employment agreement could be both relevant and admissible.

the alleged trade secrets are outside the scope of the '048 Patent, then they are clearly not germane to this action because this action is confined to the '048 Patent. If those trade secrets are embedded within the claims of the '048 Patent, then the question of misappropriation remains distinct from that of inventorship. If SWM conceived those trade secrets, then that conception is the end of the patent inquiry. That Gipson may have later misappropriated such trade secrets is logically irrelevant.

For these reasons, the injection of misappropriation of trade secrets issues into this litigation is unwarranted, and would only serve to cloud the issues at trial. Defendant has not articulated any plausible scenario in which Gipson's alleged misappropriation of trade secrets might be a defense to plaintiffs' inventorship claim. The only question presented by this litigation is who invented the invention covered by the '048 Patent. What might have happened <u>after</u> conception, or what Gipson might have done with respect to techniques and processes <u>outside</u> the patent, is entirely collateral. It would be an inefficient use of litigants' and judicial resources to devote time and attention to this collateral matter at trial. Accordingly, Defense #3 is **stricken**.

### V. Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1. Defendant's Motion for Summary Judgment (doc. 43) is **denied**.
2. Because neither side has performed a claim-by-claim analysis and it appears unlikely that all 12 claims within the '048 Patent are legitimately in dispute, the parties' respective counsel are **ordered** to conference (telephonically or otherwise) on or before **December 8, 2006** to discuss whether there is a *bona fide* disagreement as to Mattox's inventorship status for each of the 12 claims. The parties are **ordered** to file a joint status report, on or before **December 15, 2006**, stating the results of this conference and identifying which particular claims of the '048 Patent are disputed.
3. Defendant has correctly argued that the Assignment from Gipson to ChemTech excludes Gipson's interests in the '048 Patent. As such, ChemTech presently lacks standing. If ChemTech wishes to remain a plaintiff, it must execute an

appropriate assignment with Gipson, and file same on or before **December 15, 2006**.  Failure to do so will result in dismissal of ChemTech's claims without prejudice.

4.  Plaintiffs' Motion to Strike an Affirmative Defense and for a Summary Judgment on Two Affirmative Defenses (doc. 41) is **granted in part**, and **denied in part**. The summary judgment aspect of the Motion is **denied**; however, the Motion to Strike is **granted**, and Defense #3 (misappropriation of trade secrets) is **stricken** from the Answer as irrelevant to these proceedings.

DONE and ORDERED this 27th day of November, 2006.

s/ WILLIAM H. STEELE<br>
UNITED STATES DISTRICT JUDGE